**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| ROCKY L. HAWORTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 6:19-03025-CV-RK |
| | ) |
| NEW PRIME, INC., | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING DEFENDANT'S MOTION TO STAY AND
GRANTING IN PART AND DENYING IN PART
<u>PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION</u>**

Before the Court, in this action under the Fair Labor Standards Act ("FLSA"), are two motions: Defendant New Prime, Inc.'s ("Prime's") motion to stay the case (Doc. 61) and Plaintiff Rocky Haworth's motion to conditionally certify the case as a collective action (Doc. 45). For the reasons below, Prime's motion to stay is **DENIED**; Plaintiff's request for conditional certification is **GRANTED**; Plaintiff's request to approve the conditional certification notice attached to his motion is **DENIED**; and the parties are **ORDERED** to meet and confer regarding a proper conditional certification notice.

**Background**

Plaintiff alleges that Prime failed to pay him and other "B-seat" truck drivers the minimum wage in violation of the FLSA and state law. Prime's B-seat drivers are required to drive as a team with "A-seat" drivers for a certain number of miles before they can be promoted to become A-seat drivers. B-seat drivers are paid the greater of 14 cents per mile traveled by the truck or $700 a week. Plaintiff claims this violates the minimum wage because B-seat drivers are essentially on duty 24 hours a day, regardless of whether they are driving, doing other work, or in the rig's "sleeper berth."

Plaintiff's motion requests to certify a class of all employees who were B-seat drivers on or after October 2, 2015. Prime opposes the motion for conditional certification and also moves to stay this case pending resolution of another FLSA case filed in the U.S. District Court for the District of Massachusetts, *Oliveira v. New Prime, Inc.*, No. 1:15-cv-10603-PBS (D. Mass.). After

full briefing, the Court heard oral arguments. (Docs. 46, 61, 62, 64, 74, 76, 80, 81, 83 (Minute Entry).) Both motions are now ready for decision.

## Discussion

### I. Motion to Stay

Prime argues that this case should be stayed under the "first-to-file rule" because the plaintiffs in *Oliveira* make the same allegations as Plaintiff that B-seat drivers are being denied the minimum wage (among other claims), and *Oliveira* was filed first.

The Court begins with the premise that it has a "duty . . . to adjudicate a controversy properly before it." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976) (citation omitted). The Court may stay a case "if it raises issues that substantially duplicate those raised by a case pending in another court." *Ritchie Capital Mgmt., L.L.C. v. Jeffries*, 653 F.3d 755, 763 n.3 (8th Cir. 2011). "[T]he general principle is to avoid duplicative litigation." *Colorado River*, 424 U.S. at 817. "[A] carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *Id.* at 818-19. A stay is extraordinary relief, and the requesting party "must make out a clear case of hardship or inequity in being required to go forward." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936).

The first-to-file rule is part and parcel of the "doctrine of federal comity," which "permits a court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985). "The purpose of this rule is to promote efficient use of judicial resources." *Id.* "The rule is not intended to be rigid, mechanical, or inflexible, but should be applied in a manner serving sound judicial administration." *Id.* "The prevailing standard is that in the absence of compelling circumstances, the first-filed rule should apply." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1005 (8th Cir. 1993) (quotation marks and citation omitted). However, the Court has discretion in applying this rule.[1] *Id.*

---

[1] Plaintiff argues that the first-to-file rule does not apply unless plaintiffs are identical between suits. There is some support in the case law for Plaintiff's argument. *See Arnold v. DirecTV, Inc.*, No. 4:10CV00352AGF, 2011 WL 839636, at *4-5 (E.D. Mo. Mar. 7, 2011) (rejecting application of the first-to-file rule in FLSA collective actions); *Feggins v. LVNV Funding LLC (In re Feggins)*, Bankr. No. 11319, Adv. No. 14-1049-WRS, 2014 WL 7185376, at *2 (Bankr. M.D. Ala. Dec. 16, 2014) ("Because [the plaintiff] is not a party in [the other case], the 'first filed' rule does not apply here."). However, other courts, including a different judge in this district, have applied the first-to-file rule even when the plaintiffs

The Court declines to apply the first-to-file rule here because duplicative costs might never be incurred. Conditional certification is a contested and pending question in *Oliveira*, and the judge in that case has stayed her ruling until March 31, 2020, pending a potential settlement. *Oliveira*, No. 1:15-cv-10603-PBS, Docs. 229, 230. Because the *Oliveira* case might never be conditionally certified, there might never be any duplicative judicial costs from the pendency of the two cases, aside from those already incurred.[2]

Furthermore, even if both this Court and the court in *Oliveira* grant conditional certification, Prime has failed to make out a clear case of hardship or inequity in being required to go forward with both cases. Plaintiff is now represented in this Court by one of Mr. Oliveira's lawyers. According to Plaintiff's counsel, discovery would be cross-noticed in both cases, and Prime has provided no reason to believe that discovery produced in one case cannot be used in the other. Although the Court can envision some overlapping costs between the two cases (for example, the cost of drafting two certification notices and minor differences in briefing between two courts), Prime has not shown that these costs would be substantial.

On the other hand, the potential prejudice to Plaintiff from a stay is apparent. Plaintiff has a right to proceed with his case in this Court in a timely fashion to prevent evidence from becoming stale. *See Schucker*, 2017 WL 3668847, at *4 ("Nothing in the FLSA requires a party with a claim under the FLSA to join an opt-in collective action [in another court] in order to vindicate his or her rights; regardless of the posture of the other pending cases, the individual plaintiffs here are entitled to vindicate their own rights in whatever forum they choose."). Furthermore, a stay pending *Oliveira* could be lengthy. *Oliveira* has already been delayed for several years by an

---

were not the same between suits. *Hynes Aviation Indus., Inc. v. Sacramento E.D.M., Inc.*, No. 6:12-CV-03521-BCW, 2013 WL 12198837, at *2 (W.D. Mo. Aug. 1, 2013) ("'Parallel litigation' is not limited in application to litigation involving only the same parties and the same claims."); *see also Schucker v. Flowers Foods, Inc.*, No. 16-CV-3439 (KMK), 2017 WL 3668847, at *4-7 (S.D.N.Y. Aug. 24, 2017) (applying the "the principles underlying" first-to-file rule in an FLSA collective action) (quotation mark and citation omitted). The Court need not decide which line of authority to follow because the Court declines to apply the first-to-file rule on other grounds, discussed below.

[2] Perhaps the costs associated with two courts addressing two overlapping motions for conditional certification would have weighed in favor of applying the first-to-file rule earlier in this case, but Prime waited to seek a stay until after Plaintiff conducted discovery and moved for conditional certification. Prime was aware that *Oliveira* was already pending when this case was filed, and it could have sought a stay at that time. Because of Prime's delay in seeking a stay, the litigation and judicial costs associated with two federal courts considering and hearing oral arguments on overlapping motions for conditional certification are now sunk.

interlocutory appeal to the Supreme Court of the United States. Unlike in this case, the plaintiffs in *Oliveira* are currently seeking to certify a class under Rule 23 of the Federal Rules of Civil Procedure, which generally allows expanded access to interlocutory appeals. *See* Fed. R. Civ. P. 23(f); *Oliveira*, No. 1:15-cv-10603-PBS, Doc. 198.

Prime argues that issuing two conditional certification notices might confuse potential plaintiffs. However, Prime does not articulate how this potential for confusion would result in any prejudice to Prime. Plaintiff's counsel conceded at oral argument that double recovery would not be allowed for any plaintiff. Moreover, the class notices can be tailored to minimize confusion. *See Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 163 (S.D.N.Y. 2008) ("[T]he potential confusion to class members of receiving multiple notices is not a significant concern. Any possibility of confusion can be allayed through careful wording of the class notice, and any confusion that the dual notices may cause does not significantly undermine the superiority of a class action.") (quotation marks and citation omitted). For these reasons, the Court declines to stay this case pending *Oliveira*. The motion to stay will be denied.[3]

## II.     Motion for Conditional Certification

### A.     Legal Standard

The FLSA requires employers to pay most employees a regular hourly rate for up to 40 hours a week and overtime compensation at a rate of one and one-half times the regular rate for hours worked in excess of 40. 29 U.S.C. §§ 206, 207(a)(1). The FLSA also provides a private right of action to recover damages for violations of its overtime provisions, including unpaid wages, plus an equal amount of liquidated damages for violations of §§ 206 and 207. 29 U.S.C. § 216(b). An action may be brought by an employee for himself or herself and on behalf of "other employees similarly situated." *Id.* In an FLSA collective action, plaintiffs must "opt in" to participate. *Young v. Cerner Corp.*, 503 F. Supp. 2d 1226, 1228-29 (W.D. Mo. 2007).

"A district court may certify a case as a collective action only if members of the class are 'similarly situated' or raise similar legal issues regarding coverage, exemption, or nonpayment of wages." *Taylor v. Bear Communs.*, LLC, No. 4:12-CV-01261-BCW, 2013 U.S. Dist. LEXIS 90352, at *4 (W.D. Mo. June 27, 2013) (citation omitted). "The plaintiff bears the burden of

---

[3] Prime has withdrawn its request to stay this case pending a decision in *Petrone v. Werner Enterprises, Inc.*, 940 F.3d 425 (8th Cir. 2019), so the Court need not address this argument. (Doc. 81 at 13.)

establishing he or she is similarly situated to other members of the proposed class." *Id.* (citation omitted). The FLSA does not define the term "similarly situated," and federal courts have applied varying standards to determine whether potential opt-in plaintiffs are "similarly situated" under § 216(b). *Kautsch v. Premier Communs.*, 504 F. Supp. 2d 685, 688-89 (W.D. Mo. Jan. 23, 2007). Although the Eighth Circuit has not articulated a standard for conditionally certifying FLSA classes, the majority of the district courts in the Eighth Circuit use a two-step process. *Id.* (collecting cases); *see also Taylor*, 2013 U.S. Dist. 90352 at *5 (collecting cases).

During the first stage of the two-step process, the named plaintiff moves for class certification for the limited purpose of providing notice to putative class members. *Kautsch*, 504 F. Supp. 2d at 688. During this stage, the "similarly situated" threshold requires only a "modest factual showing." *Id.* at 689 (quoting *Realite v. Ark Restaurants Corp.*, 7 F. Supp.2d 303, 306 (S.D.N.Y. 1998) and citing *Davis v. Novastar Mortgage, Inc.*, 408 F. Supp.2d 811, 815 (W.D. Mo. 2005)). Courts do not evaluate the merits of the plaintiff's claim at this early stage. *Polzin v. Schreiber Foods, Inc.*, No. 10-1117-CV-SW-GAF, 2011 U.S. Dist. LEXIS 142955, at *7 (W.D. Mo. Aug. 15, 2011). Instead, a plaintiff "need only establish a colorable basis for [a] claim that the putative class members were together the victims of a single decision, policy, or plan." *Id.* at *8 (internal quotation marks omitted). This "lenient standard generally results in conditional certification of a representative class." *Id.* at *9. Any doubts in the notice stage should favor allowing conditional certification. *Id.*

If the Court allows conditional certification of a class, putative class members are given notice and the opportunity to opt in, and the action proceeds as a collective action throughout discovery. *Id.* at *8. "At the second step of the process, the defendant may move to decertify the class." *Id.* This step generally occurs after discovery is complete when the parties and the Court have more information. *Kautsch*, 504 F. Supp. 2d at 688.

**B.     Conditional Certification in This Case**

Plaintiff has shown a colorable basis for his claim that B-seat drivers were the victims of a single decision, policy, or plan by Prime that violated the FLSA. Prime pays its B-seat drivers either a flat rate of $700 per week or 14 cents a mile, whichever is greater. (Doc. 74-1 at 57-59.) Prime's corporate representative testified at a Rule 30(b)(6) deposition that its practice is to compare B-seat drivers' pay with only two categories of their "Qualcomm" time logs. (*Id.* at 73-75.) Qualcomm logs, which are used by drivers to report compliance with safety

5

regulations promulgated by the U.S. Department of Transportation ("DOT"), have four categories: (1) driving, (2) on-duty but not driving, (3) off-duty, and (4) sleeper-berth. (*Id.* at 43.) *See* 49 C.F.R. § 395.8(b) (specifying these four categories). Prime counts only the driving and on-duty time as compensable for FLSA purposes. (Doc. 74-1 at 74-75.) Plaintiff argues that all four categories should be counted because B-seat drivers are essentially "'on-duty' for 24 hours a day, for days on end, due to the nature of long-haul trucking." (Doc. 1 ¶ 16.)

The minimum wage is currently $7.25 an hour. 29 U.S.C. § 206(a)(1)(C). Plaintiff has submitted uncontested evidence showing that, in one particular eight-day period, he logged 170.3 hours through Qualcomm but was paid only $644.70. This amounts to $3.79 per hour logged.[4] (Doc. 46 at 9.) Plaintiff has also submitted uncontested evidence suggesting that another B-seat driver was paid $46.08 for 77.47 hours of time logged through Qualcomm, which amounts to 59 cents per hour logged. (*Id.* at 10.)

Plaintiff suggests that the Court should assume off-duty and sleeper-berth time are compensable at this stage of the proceedings and not reach the merits of this question until step two of the conditional certification process. Although it would be premature to definitively evaluate the merits at this stage, the Court needs to at least analyze the legal framework to address Plaintiff's motion for conditional certification. The relevant question is whether Plaintiff has a colorable claim that he is among a similarly situated class of people who were the *victims* of a single decision, policy, or plan. *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 939 (D. Minn. 2009). "In other words, the putative class members must be harmed by an *unlawful* companywide policy." *Id.* This requires at least a peak at the merits.

The Court will first address the interplay between the DOT regulations and those of the U.S. Department of Labor ("DOL"). The Court will then turn to Prime's arguments that conditional certification is barred because (1) there are too many individualized questions, and Plaintiff is not a representative class plaintiff; (2) most of the class signed binding arbitration agreements; and (3) Plaintiff's proposed class notice is inadequate. Prime's arguments fail for the reasons discussed below.

---

[4] The parties do not explain, and the record is unclear, why Plaintiff was not paid $700 for the time period in question (i.e., the greater of $700 or 14 cents a mile). Even if Plaintiff had received $700, his hourly rate still would have been just $4.11 per hour logged. The parties also do not explain why this pay period was calculated using eight days instead of seven, but Prime does not dispute that a minimum wage violation occurred for Plaintiff during this time period if all off-duty and sleeper-berth time is compensable.

6

### 1.     DOT Regulations

Contrary to Prime's assumption, the DOT's on-duty and off-duty designations "do not govern whether time is compensable under the FLSA." *Montoya v. CRST Expedited, Inc.*, 404 F. Supp. 3d 364, 394 (D. Mass. 2019).  In other words, even if the DOT would be satisfied that a driver was sufficiently "relieved of duty" under its safety regulations, the driver might still need to be paid.  *Julian v. Swift Transp. Co.*, 360 F. Supp. 3d 932, 943-44 (D. Ariz. 2018) (quoting Part 395, Section  395.2: Definitions, Q&A, Fed. Motor Carrier Safety Admin. ("FMCA"), *available at*  https://www.fmcsa.dot.gov/regulations/title49/section/395.2).  This is because the DOT regulations are geared toward different policy concerns—highway safety, not how employees must be paid.  *Browne v. P.A.M. Transp., Inc.*, No. 5:16-CV-5366, 2018 WL 5118449, at *3 (W.D. Ark. Oct. 19, 208).  Both the DOT and the DOL have stated that the DOT's on-duty/off-duty designations do not govern for FLSA purposes, and even the DOT has pointed out that some employers' misunderstanding of this may have led to FLSA violations.  *See id.* at *3 & n.1 (citing DOL Field Operations Handbook ("DOL Handbook") § 14g03(b) (Mar. 31, 2016), *available at* https://www.dol.gov/whd/FOH/FOH_Ch14.pdf; and Notice of Proposed Rulemaking by the DOT's FMCA, 65 Fed. Reg. 25540-01, 25564-65 (May 2, 200)).

Nonetheless, the Court believes the DOT regulations are relevant to the extent they provide useful background and context for understanding the employment relationship.  The court in *Julian* summed up the pertinent DOT scheme nicely as follows:

> The DOT regulations impose a complicated scheme regarding the maximum amount of time a driver can log in the "driving" or "on duty not driving" statuses. 49 C.F.R. § 395.3.  Somewhat simplified, a driver cannot be logged as "driving" or "on duty not driving" for more than "70 hours in any period of 8 consecutive days." 49 C.F.R. § 395.3(b)(2).  In addition, a driver cannot be logged as "driving" for more than 11 hours "during a period of 14 consecutive hours after coming on duty." 49 C.F.R. § 395.3(a)).  After exhausting one's available driving time, a driver must take "10 consecutive hours off duty."  *Id.*

360 F. Supp. 3d at 937.

### 2.     DOL Regulations

In contrast to the DOT regulations, the Court may properly resort to DOL regulations in determining what constitutes "work" under the FLSA.  *Henson v. Pulaski Cnty. Sheriff Dep't*, 6 F.3d 531, 535 (8th Cir. 1993).  The DOL regulations addressing "waiting time" are informative

7

in this situation. 29 C.F.R. §§ 785.14 through 785.17. The Court will also address Prime's arguments that sleeper-berth time is not compensable under a DOL regulation addressing work performed while traveling, 29 C.F.R. § 785.41, and Prime's argument that Plaintiff implicitly agreed not to be paid for eight hours of sleeper-berth time a day under 29 C.F.R. § 785.22.

### a. Waiting Time

Under the DOL's waiting-time regulations, a person is "on duty" and must be paid when he or she is "engaged to wait," but "off duty" when "waiting to be engaged." 29 C.F.R. § 785.14. This analysis requires a common-sense inquiry that depends on the particular circumstances of the case. *Id.* A person is "waiting to be engaged" and thus "off duty" if he or she can "use the time effectively for his [or her] own purposes." *Id.* § 785.16(a). If not, the person is "engaged to wait" and must be paid because he or she is "on duty" for FLSA purposes. *Id.* § 785.15; *see also id.* § 785.17 (a person is also working if required to be "on call"). An employee "is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may *leave the job* and that he will not have to commence work until a definitely specified hour has arrived." *Id.* § 785.16(a) (emphasis added).

> For truck drivers, the DOL waiting-time regulations provide specific examples:
>
> A truck driver who has to wait at or near the job site for goods to be loaded is working during the loading period. If the driver reaches his destination and while awaiting the return trip is required to take care of his employer's property, he is also working while waiting. In both cases the employee is engaged to wait. Waiting is an integral part of the job. On the other hand, for example, if the truck driver is sent from Washingtion, DC [sic] to New York City, leaving at 6 a.m. and arriving at 12 noon, and is completely and specifically relieved from all duty until 6 p.m. when he again goes on duty for the return trip the idle time is not working time. He is waiting to be engaged.

*Id.* § 785.16(b) (citations omitted).

Here, Plaintiff has made a colorable claim that he and other B-seat drivers were essentially on duty for 24 hours a day even for the periods they logged as off-duty and sleeper-berth time due to the nature of long-haul team driving. (Doc. 1, Complaint ¶ 16.) Plaintiff alleges that B-seat drivers drive, ride, study, and work around the clock for days on end to get the miles they need to become A-seat drivers, and they are often required to remain in or near the truck at all times during long hauls across the country. (Doc. 46 at 4, 7.) Prime's corporate representative confirmed at a Rule 30(b)(6) deposition that some loads require at least one driver to remain in the truck at all times; that A-seat drivers are in control of all operational decisions, including routing, where to

fuel, and who takes which shift; that teams can drive "up to twice as long" compared to single-driver arrangements and still stay within DOT regulations; and that "the goal of a team driving situation is to try to keep the truck moving as much as possible." (Doc. 74-1 at 21-22, 35-43, 51.)

Plaintiff testified at his deposition that "pretty much everybody" at Prime, including other drivers and his instructors, told him he "was expected to leave the [sleeper] berth at any time to perform work." (Doc. 74-2 at 2-4.) There were also instances where Prime advised him he could record off-duty time when he was actually doing inspections or assisting the driver as a passenger. (Doc. 47, Declaration at 11.) Plaintiff also claims that, sometimes, the driver would wake him up while he was in the sleeper berth to perform work, and when he was paired with one particular driver, he wasn't allowed to use the sleeper berth at all while the truck was moving. (*Id.* at 2; Doc. 66-4 at 8, 10-11, 26.) Prime's corporate representative admitted during the Rule 30(b)(6) deposition that B-seat drivers are allowed to record time spent performing certain inspections as off-duty time, and that it is "not unusual" for drivers to be asked to make work-related phone calls on sleeper-berth time. (Doc. 74-1 at 33, 47, 75-76; *see also* Doc. 66-8 at 4 (written instructions from Prime allowing drivers to log certain pre- and post-trip inspections as off-duty time).)

This is sufficient to support a colorable claim that B-seat drivers could not use their sleeper-berth or off-duty time effectively for their own purposes. This situation is unlike the driver from the example in § 784.16(b), who had a six-hour layover "completely and specifically relieved from all duty." In a sense, it seems B-seat drivers are never allowed to "leave the job" when they are on the road. According to Plaintiff, they must spend the majority of their sleeper-berth and off-duty time in or near a truck that is almost constantly moving—and even that time is subject to frequent interruptions.

### b.     Work Performed While Traveling Under 29 C.F.R. § 785.41

Prime argues that sleeper-berth time is not compensable under the DOL's regulation addressing "work performed while traveling," which provides as follows:

> Any work which an employee is required to perform while traveling must, of course, be counted as hours worked. An employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding, *except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer.*

29 C.F.R. § 785.41 (emphasis added). Prime points to the DOL Handbook which states that "[b]erths in trucks are regarded as adequate sleeping facilities" for purposes of § 785.41, including

9

for team drivers. *See* DOL Handbook § 31b09(a) (Aug. 10, 2016), *available at* https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch31.pdf.

The Court does not apply *Chevron*-level deference to the DOL Handbook but does defer to the agency's expertise to the extent it is persuasive. *Baouch v. Werner Enters., Inc.*, 908 F.3d 1107, 1117 (8th Cir. 2018). Prime has plucked out a particular portion of § 31b09(a) without providing context. When read in isolation, the part of § 31b09(a) quoted above seems to suggest that no sleeper-berth time counts as compensable for team drivers under 29 C.F.R. § 785.41. The rest of § 31b09, however, shows that the DOL was simply pointing out that *some* sleeper-berth time *can* be excluded for team drivers *if there is an agreement* to that effect. Subsections 31b09(b) and (c) of the Handbook provide that, "in the absence of an express or implied agreement concerning the exclusion of sleep time, the time spent sleeping constitutes hours worked even though the tour of duty exceeds 24 hours."[5] Prime has failed to show that it has such an agreement with Plaintiff or any other B-seat driver, as discussed below regarding 29 C.F.R. § 785.22.

The parties cite competing authorities interpreting 29 C.F.R. § 785.41 in the context of sleeper-berth time in a moving truck. Prime cites *Nance v. May Trucking Co.*, 685 F. App'x 602, 605 (9th Cir. 2017) (stating that "drivers are not entitled to compensation for time they are permitted to sleep in the berths of moving trucks"); *Petrone v. Werner Enters., Inc.*, No. 8:11CV401, 2017 WL 510884, at *5 (D. Neb. Feb. 2, 2017) (holding that "§ 785.41 creates a presumption that truck drivers are *not* on duty when in a sleeper berth"); and a recent DOL opinion letter (Doc. 66-6 at 4, DOL Wage & Hour Division Op. FLSA2019-10 (July 22, 2019) (stating that "the time drivers are relieved of all duties and permitted to sleep in a sleeper berth is presumptively nonworking time that is not compensable" and that this presumption "holds true regardless of whether the truck is moving or stationary")).

Plaintiff cites *Browne*, 2018 WL 5118449 at *2-5 (holding that sleeper-berth time is compensable absent an agreement to the contrary under 29 C.F.R. § 785.22); *Montoya*, 404 F. Supp. 3d at 393-95 (finding the DOL opinion letter not persuasive and holding, in light of the waiting-time regulations, that sleeper-berth time is compensable for team drivers except eight hours a day); *Julian*, 360 F. Supp. 3d at 943-52 (holding that sleeper-berth time is compensable except eight hours a day); and *Wooldridge v. Gateway Transportation of Georgia, Inc.*, No. 4:19-

---

[5] For tours of duty less than 24 hours, § 31b09(a) of the Handbook provides that all sleeper-berth time is compensable under 29 C.F.R. § 785.21 regardless of whether there is an agreement.

CV-0053-HLM-WEJ, 2019 WL 2610904, at *4-5 (N.D. Ga. June 24, 2019) (finding *Julian* and *Browne* persuasive despite *Petrone* and the district court's decision in *Nance*), *report and recommendation adopted*, 2019 WL 5549274 (N.D. Ga. July 12, 2019).

At this early stage of the proceedings, the Court is more persuaded by Plaintiff's cases. On this limited record, the Court sees nothing in the FLSA or DOL regulations to support the "presumption" recognized by the court in *Petrone* and recited by the DOL's recent opinion letter that sleeper-berth time in a moving truck is not compensable. Again, context is important here. Whether "sleep time must be compensated in a particular case is a question of fact," which "involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances . . . ." *Bouchard v. Regional Governing Bd. of Region V Mental Retardation Servs.*, 939 F.2d 1323, 1327 (8th Cir. 1991) (quotation marks and citation omitted).

At least in a team-driving situation, the "presumption" recognized in *Petrone* and the DOL opinion letter that sleeper-berth time is not compensable seems to ignore the waiting-time regulations that specify when a trucker is "on duty." As discussed above, B-seat drivers are typically confined in or near their trucks and cannot come and go during sleeper-berth and off-duty time like non-team drivers. Such a "presumption" also seems to ignore 29 C.F.R. § 785.22, which implies that sleeping time is compensable when a person is on duty for 24 hours or more unless the parties have an agreement to the contrary. *See Armstrong v. Palmer*, 879 F.2d 437, 439 (8th Cir. 1989) (noting that two regulations addressing the same subject-matter "must be read together to give effect, if possible, to both provisions") (cleaned up); *Julian*, 360 F. Supp. 3d at 951 n.16 ("Both § 785.22 and § 785.41 appear to have been promulgated on November 29, 1955."). As discussed below, Prime has failed to show that it has an agreement with any B-seat driver to exclude any amount of sleeper-berth time. Accordingly, § 785.41 does not prohibit conditional certification.

### c. Sleep-Time Agreements Under 29 C.F.R. § 785.22

Prime next argues that, even if B-seat drivers are on duty for 24 hours a day, Plaintiff implicitly agreed to exclude eight hours a day from compensable time under 29 C.F.R. § 785.22, which provides as follows:

> Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period [sic] is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

Prime has failed to show that it has such an agreement with Plaintiff or any other B-seat driver. It cites *Baker v. Stone County, Missouri* and other cases for the proposition that "continuance of employment can be evidence of an implied agreement to the terms of that employment." 41 F. Supp. 2d 965, 993 (W.D. Mo. 1999) (quotation marks and citations omitted). However, there is nothing in the record here to suggest that an eight-hour deduction of sleeper-berth time was part of the terms of any B-seat driver's employment. To the contrary, it is undisputed that B-seat drivers were paid the greater of 14 cents a mile or a flat rate of $700 regardless of "[w]hat they put into Qualcomm." (Doc. 74-1 at 71.) Prime's corporate representative also admitted that there were no agreements with B-seat drivers to change their pay based on how much time they logged in the sleeper berth. (*Id.* at 71-73.) Prime seems to be suggesting that an eight-hour sleeper-berth deduction was implicitly factored into its pay structure, but there is no evidence any B-seat driver was aware of this and implicitly accepted it by continuing to work. Accordingly, § 785.22 does not prohibit conditional certification.

### 3. Individualized Questions and Adequacy of Representation

Prime next argues that conditional certification should be denied because the Court will be required to answer individualized questions about how much off-duty and sleeper-berth time was actually compensable for each B-seat driver in order to determine who has a valid FLSA claim. (Doc. 64 at 11-15.) As discussed above, however, Plaintiff's theory is that all off-duty and sleeper-berth time is compensable for B-seat drivers due to the nature of team driving for long hauls. Prime fails to address whether individualized inquiries will be required if all sleeper-berth and off-duty time is compensable.

Prime argues that Plaintiff's 24-hour theory does not apply to all B-seat drivers because Plaintiff admitted in his deposition that some of them sometimes drive in smaller loops close enough to home to stay there at night. (*Id.* at 14.) Plaintiff also suggested that he lacked knowledge about drivers in other divisions of the company. (*Id.*) However, there is no evidence in the record

12

to suggest that loop driving was common for B-seat drivers. To the contrary, Prime's corporate representative stated during the Rule 30(b)(6) deposition that teams can drive "up to twice as long" as single drivers and that the "the goal of a team driving situation is to try to keep the truck moving as much as possible." (Doc. 74-1 at 42-43, 51.) This suggests that loop driving was the rarity rather than the norm for B-seat drivers. Plaintiff's burden at this stage is a modest one, and Prime must do more than suggest a mere possibility that some potential class members might not fit the mold.

In addition, the fact that some B-seat drivers may have driven in loops does not necessarily mean they were properly paid. The DOL regulations suggest that sleep time must be compensated for tours of duty that last fewer than 24 hours. 29 C.F.R. § 785.21. In other words, while an employer might be able to obtain an agreement to deduct up to eight hours of sleeper-berth time for a shift that lasts 24 hours or longer under 29 C.F.R. § 785.22, this would not be possible for tours of duty that last fewer than 24 hours.

Prime also suggests that "evidence regarding [a] small fraction of [the] nationwide population [is] insufficient to warrant conditional certification." (Doc. 64 at 15.) It cites *Brooks v. C.H. Robinson International, Inc.*, No. 16-CV-0939-CV-W-BP, 2018 WL 5818377, at *4 (W.D. Mo. July 6, 2018); *Saleen*, 649 F. Supp. 2d at 942; and *Wacker v. Personal Touch Home Care, Inc.*, No. 4:08CV93 CDP, 2008 WL 4838146, at *3 (E.D. Mo. Nov. 6, 2008). Those cases are unlike this case because Plaintiff has supplied the Court with admissions from Prime's corporate representative that support his motion for conditional certification. In *Brooks*, the plaintiffs failed to support their motion because they did not obtain any information about the defendant's nationwide practices from the defendant itself during discovery. 2018 WL 5818377, at *4. In *Saleen*, the plaintiffs' submission of over 100 declarations from employees in 47 states was insufficient because they failed to rebut the defendant's evidence that it did not have a nationwide unlawful policy. 649 F. Supp. 2d at 940-41. And in *Wacker*, an affidavit from one local manager was not enough to show a nationwide practice when other company officials refuted the local manager's claims about practices in other regions. 2008 WL 4838146, at *4.

Unlike in *Brooks* and *Saleen*, Plaintiff has come forward with admissions from Prime's corporate representative supporting his assertion that B-seat drivers were typically on the road for days on end but paid only the greater of $700 a week or 14 cents a mile. *See*

13

*Davis v. NovaStar Mortg., Inc.*, 408 F. Supp. 2d 811, 817 (W.D. Mo. 2005) (admissions by corporate representatives about companywide practices may support conditional certification). And unlike in *Wacker*, Prime has not come forward with any evidence to the contrary.[6]

### 4. Arbitration Agreements

Prime argues that conditional certification should be denied because most of the proposed class has agreed to arbitrate their claims, as well as any threshold disputes about arbitrability. Plaintiff argues that Prime has failed to show any B-seat driver assented to an arbitration agreement, rather than opting out. The Court agrees with Plaintiff.

#### a. Exclusion of Arbitration Employees from a Class List

The Eighth Circuit has not addressed whether employees who signed arbitration agreements should be included in a class list for purposes of conditional certification. One judge in this district has held that they should be included because arbitration issues are irrelevant at the conditional certification stage. *See Brooks v. C.H. Robinson Int'l, Inc.*, No. 416CV00939761HFS, 2017 WL 10506772, at *3 (W.D. Mo. May 9, 2017). Another has ruled similarly, at least when there is no motion before the Court to compel the named plaintiff to arbitration. *Davis v. NovaStar Mortg., Inc.*, 408 F. Supp. 2d 811, 818 (W.D. Mo. 2005). In contrast, this Court has previously determined that people who signed binding arbitration agreements should be excluded from the class list. *Astarita v. Menard, Inc.*, No. 5:17-CV-06151-RK, 2018 WL 7048693, at *2 (W.D. Mo. Dec. 7, 2018); *see also Astarita v. Menard, Inc.*, No. 5:17-06151-CV-RK, 2019 WL 6012852, at *3 (W.D. Mo. Nov. 14, 2019). At least two circuits have now ruled in line with the approach this Court took in *Astarita*. *See Bigger v. Facebook, Inc.*, 947 F.3d 1043 (7th Cir. 2020) (arbitration employees must be excluded); *In re JPMorgan Chase & Co.*, 916 F.3d 494 (5th Cir. 2019) (same).

*Astarita* is different from this case, however, because the Court had already compelled one of the named plaintiffs to arbitration at the time the Court took up the motion for conditional certification. *See Astarita v. Menard, Inc.*, No. 5:17-06151-CV-RK, 2018 WL 5928061, at *5

---

[6] The Court noted in a prior Order in this case that, in some situations, more than a single declaration may be required to support conditional certification. (Doc. 67 at 2 (citing *Kafka v. The Melting Pot Rests., Inc.*, No. 4:17-cv00683-HFS, Doc. 102 at 10 (W.D. Mo. Apr. 30, 2019)). *Kafka* is distinguishable from this case for the reason just mentioned. Plaintiff has submitted more than his own declaration to support his motion; he has also submitted admissions from Prime's corporate representative.

(W.D. Mo. Nov. 13, 2018).  Here, Prime has withdrawn its motion to compel Plaintiff to arbitration.  After Plaintiff opposed the motion to compel in this case, it was "no longer clear" to Prime "whether [P]laintiff intended to opt in to the Arbitration Clause or to opt out of it." (Doc. 16 at 1.)  Prime has failed to articulate why Plaintiff is any different from other B-seat drivers on the arbitration issue, and a review of the procedures used to execute its purported arbitration agreements reveals why it has failed to show that any B-seat driver assented to arbitration.

Before turning to that issue, however, the Court will first take a detour to address the relevant case law that has been handed down since the Court compelled arbitration in *Astarita*.

### b. *New Prime Inc. v. Oliveira* and *Theroff v. Dollar Tree Stores, Inc.*

Both the Supreme Court of the United States and the Supreme Court of Missouri have handed down decisions that bear on the arbitration issues presented here.  In *New Prime Inc. v. Oliveira* (which is the same *Oliveira* case now pending in the District of Massachusetts), the Supreme Court addressed § 1 of the Federal Arbitration Act ("FAA"). 139 S. Ct. 532, 538 (2019).  That provision "exempts . . . contracts of employment of transportation workers."  *Id.*   The Supreme Court held in *Oliveira* that courts should decide for themselves whether § 1 applies even when there is a delegation provision in an alleged arbitration agreement. *Id.* The Court also held that § 1 applies to both employees and independent contractors.  *Id.* at 538-44.  In light of *Oliveira*, Prime has conceded in this Court that the FAA does not apply to the B-seat drivers at issue in this case, given the exemption in § 1 of the FAA.  It resorts, instead, to the Missouri Uniform Arbitration Act ("MUAA"), which does not have a similar exemption.

Drawing on the logic in *Oliveira*, the Supreme Court of Missouri recently held in *Theroff v. Dollar Tree Stores, Inc.*, that (1) the existence of an agreement to arbitrate is a prerequisite to compelling arbitration under the MUAA, and (2) in the absence of such an agreement, a delegation provision is not effective.  591 S.W.3d 432, 436-42 (Mo. banc 2020).  *Theroff* abrogated a decision that this Court relied on in *Astarita* (*State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36 (Mo. banc 2017)) "to the extent . . . [it] can be read to suggest one can be forced into arbitration by a contract to which one is a stranger."  591 S.W.3d at 439.  Under *Theroff*, the Court must decide whether there is "mutual assent" to create an arbitration contract before even threshold questions of arbitrability can be compelled to an arbitrator.  *Id.* at 438-42; *see also Shockley v. PrimeLending*, 929 F.3d 1012, 1019 (8th Cir. 2019) (applying Missouri law and concluding "[w]ithout an acceptance, no contract was formed as to the delegation provision");

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (Although "parties may delegate threshold arbitrability questions to the arbitrator," the parties' agreement must do so "by clear and unmistakable evidence.") (quotation marks and citations omitted).

### c. The Fifth and Seventh Circuits' Framework for Assessing Arbitrability at the Conditional Certification Stage

Under the framework set out by the Fifth and Seventh Circuits, "[t]he employer seeking to exclude employees from receiving notice has the burden to show, by a preponderance of the evidence, the existence of a valid arbitration agreement for each employee it seeks to exclude from receiving notice." *Bigger*, 947 F.3d at 1050; *JPMorgan Chase*, 916 F.3d at 502-03. The Court does not "simply take an employer at its word when it says certain employees entered valid arbitration agreements." *Bigger*, 947 F.3d at 1051. "[I]f the employer does not prove that an employee entered a valid arbitration agreement, then the court may authorize notice to that employee." *Id.* at 1050.

"Determining whether there is a valid arbitration agreement is a question of state contract law and is for the court." *JPMorgan Chase*, 916 F.3d at 502. As discussed above, the relevant question under *Theroff* is whether any B-seat driver assented to an arbitration agreement. 591 S.W.3d at 438-42. "The critical question when measuring if a party's words or conduct constitute acceptance is whether the signals sent by the offeree to the offeror objectively manifest the offeree's intent to be presently bound." *Miller v. Securitas Sec. Servs. USA Inc.*, 581 S.W.3d 723, 730 (Mo. App. 2019) (cleaned up).

### d. Prime's Procedure for Executing Training Program Contracts

Prime has failed to meet its burden of showing that any arbitration agreements exist with B-seat drivers. According to a declaration from Prime's corporate representative, it has used a template "Training Program Contract" since 2016. (Doc. 65 at 2 ¶ 4.) The four-page template is attached as Exhibit 1 to the declaration. (*Id.* at 2 ¶ 4, 5-8.)

The template contains two arbitration clauses. (*Id.* at 6, 7.) One appears on the second page, near the end of the terms and conditions of the contract but before the signature line. (*Id.* at 6.) It states that any controversy or claim "relating to this contract" will be resolved by the AAA Commercial Arbitration Rules. (*Id.* at 6.) Those rules, in turn, provide that the arbitrator has the power to determine questions of arbitrability. (Doc. 66-7 at 14.) The second arbitration clause appears on its own separate page (page three of the template) and contains its own signature

line.  (Doc. 65 at 7.)  It states that it covers "any disputes arising under, arising out of or relating to this agreement, including . . . any disputes arising from the relationship created by the agreement" and "any question that in any manner involves forum or jurisdictional matters respecting the arbitrability of disputes between the parties."  (*Id.*)

> Page three states as follows regarding the ability to opt out of arbitration:
>
> You are permitted to opt out of the arbitration clause contained in this paragraph by submitting to Prime written notice of your opt out decision within one year of your signature date.  *Though any communicated intention to opt out of arbitration will be honored by Prime*, provided for your convenience on the next page is an opt out notice template that may be used to communicate your opt out notice to Prime by either physical mail or e-mail.

(*Id.* (emphasis added).)  Page four is a form letter addressed to Prime that states as follows:

> On the ___ Day of ____ 20____ I am authorized by Prime's application for employment to opt out of arbitration in the event of any resulting legal dispute with Prime.  By submitting this email [or letter], I am providing to you my notice to opt out of arbitration, and no further action is required on my part to accomplish arbitration opt-out.

(*Id.* at 8 (brackets in original).)  Page four then contains a blank for a signature.  (*Id.*)

In the declaration Prime has submitted to this Court, its corporate representative states as follows:

> Exhibit 1 is completed using software maintained by Ten Street.  The software permits users to review the contracts electronically and insert an electronic signature.  For each "module" in the software, there is a signature field *at the end of the module*.  If more than one page within that module requires a signature, the signature provided at the end of the module is affixed to *all blanks inside that module*; as a result, some multiple-page documents will bear identical signatures when printed in hard copy.  For purposes of the software, *all of the pages of the Training Program Contract attached as Exhibit 1 are a single module*.  Other contracts, including a non-compete contract, are separate modules.

(*Id.* at 2 ¶ 4 (emphasis added).)

This is insufficient to show that any B-seat driver "objectively manifest[ed] . . . intent to be presently bound" to an arbitration agreement.  *Miller*, 581 S.W.3d at 730.  B-seat drivers were presented with a template Training Program Contract to sign at the end, that simultaneously included both an arbitration clause on page three with a signature line and an opt-out form on page four with a signature line.  They were then asked to sign at the end of the electronic module.  The parties clarified during oral argument that, despite the wording of Prime's declaration, signatures were not actually applied to the opt out forms.  This does not change the fact, however, that drivers

were asked to sign only once at the end of the module, the last page of which was an opt out form. As a result, the Court cannot say with any degree of certainty on this record whether the drivers intended to sign both the contract and the opt-out form or just the contract.

Prime argues that the majority of the proposed class members "executed the agreement and did not follow the opt-out procedure." (*See id.* at 3 ¶ 6.) Presumably, Prime is referring to the procedure of emailing or mailing Prime a signed opt-out form. However, it is apparent that this method of opting out was optional. Nothing in the four pages of the template states that this was the *only* way to opt out. To the contrary, the second arbitration clause specifically states that the opt-out form was being provided for "convenience" and that "any communicated intention to opt out of arbitration will be honored by Prime." (*Id.* at 7.) Accordingly, there is insufficient evidence in the record to conclude that any B-seat driver assented to arbitration—of threshold questions or otherwise.[7]

### 5. Class Notice

Finally, Prime argues that conditional certification should be denied because the proposed class notice is deficient for various reasons, including that the disclaimer is inadequate; that the notice should advise potential class members that they could be liable for costs; that it contains misleading information about attorneys' fees; and that the notice period should be shorter than 90 days. Plaintiff stands by its proposed notice. The Court will not outright deny conditional certification simply because Prime takes issue with some parts of Plaintiff's proposed notice, especially given that Prime acknowledges the parties have not met and conferred on these issues. The Court will not wade into these issues until after the parties have attempted to reach an agreement. Accordingly, the Court will order the parties to meet and confer regarding a proper class notice.

### Conclusion

Accordingly, the Court **ORDERS** as follows:

1. Prime's motion to stay is **DENIED**. (Doc. 61.)
2. Plaintiff's motion for conditional certification is **GRANTED in part** and **DENIED in part**. (Doc. 45.) Specifically, Plaintiff's request for conditional certification is

---

[7] As a result, the Court need not reach Plaintiff's additional argument that the agreements, even if they exist, do not cover B-seat drivers because they apply only to trainees.

**GRANTED**, but Plaintiff's request to approve the notice attached to his motion is **DENIED**.

3. By April 6, 2020, the parties shall meet and confer regarding the form of a conditional certification notice and either submit a joint proposed notice for the Court's approval or request a telephone conference with the Court regarding any remaining disputes about the form of the notice.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED:  March 23, 2020